BEAL, and husband, Plaintiffs-Appellants, v. FIRST FED-
ERAL SAVINGS & LOAN ASSOCIATION OF MADISON,
Defendant-Respondent.

Supreme Court

*No. 76–463. Argued January 31, 1979.—Decided June 12, 1979.*
(Also reported in 279 N.W.2d 693.)

174

For the appellants there were briefs and oral argument by *James N. Youngerman* of Madison.

For the respondent there was a brief by *Frank J. Bucaida* and *Axley, Brynelson, Herrick & Gehl* of Madison, and oral argument by *Mr. Bucaida.*

HEFFERNAN, J.   The principal question posed here is whether a federal savings and loan association which has extended a loan for the maximum thirty-year period and determined by mutual agreement with the borrower what the monthly payments will be can, by the activation of an interest-escalation clause, increase the amount of money to be allocated for the payment of interest out of each monthly payment for the early years of the loan and thereafter sharply reduce the amount to be allocated to interest, this providing for the payment of the note within the original thirty-year period.

We conclude that this manipulation of interest payments, where the loan period is already at the maximum of thirty years, is not permitted by the regulations of

the Federal Home Loan Bank Board, because at least a portion of the payments do not conform with a standard amortization schedule, which would permit the loan to be paid off within the thirty-year period. We therefore reverse the order of the circuit court.

Other questions ancillary to the principal question are also considered herein.

An understanding of the problem requires a statement of the facts. Cherokee Park, Inc., a real estate development corporation, built homes in the City of Madison. Cherokee Park's development project was financed by First Federal Savings and Loan Association. The particular house and lot in this case were financed by First Federal by Cherokee Park's execution of a note and mortgage which provided that the mortgage note, in the sum of $55,000, was to be paid in installments of $376.57 per month for a term of thirty years. These payments were computed at the rate of 7¼ percent interest per annum. The mortgage note executed by Cherokee Park to First Federal provided that the rate of interest due on the note could be varied by First Federal as the interest First Federal paid to its depositors varied. This agreement was entered into between Cherokee Park and First Federal on March 21, 1973.

On April 21, 1973, the plaintiffs, Diane and Richard Beal, offered to purchase the house and lot previously the subject of the mortgage and note executed on March 21, 1973. In the Beals' offer to purchase, they agreed to assume the existing mortgage and specifically agreed to the repayment of that pre-existing mortgage in installments of $376.57 per month for the term of thirty years, with the proviso that these payments were to be computed at the rate of 7¼ percent. The real estate agreement was closed on this basis. On May 18, 1973, Cherokee Park conveyed the house and lot to the Beals by a deed which included a clause reciting that the Beals agreed to assume the obligations of Cherokee Park's mortgage with First Federal executed on March

21, 1973. At this stage of the proceedings, when the Beals signed the assumption agreement, it is undisputed that they were not told that the underlying contract between Cherokee Park and First Federal provided for variable interest. They were never shown a copy of the mortgage note, and they signed the assumption agreement in the belief that the interest rate would remain $7\frac{1}{4}$ percent for the full thirty-year term of the loan. They alleged that they would not have executed the agreement had they known of the variable-interest provision.

On September 22, 1973, after making only two payments at the $7\frac{1}{4}$ percent rate, the Beals were notified by First Federal that effective on October 1, 1973, the interest to be charged on their loan would be 8 percent. The Beals allege that it was not until the receipt of this notice that they knew that there was a variable-interest-rate provision in the mortgage note which they had assumed. They were never shown a completed federal Truth in Lending form until November 7, 1973. The increased interest rate was put into effect by First Federal on October 1, 1973. The monthly payments have remained at the agreed amount of $376.57. However, these payments have been applied to principal and interest in the proportion required for the 8 percent rate rather than the $7\frac{1}{4}$ percent rate which the Beals agreed to.

12 C.F.R. sec. 545.6–1(a)(1) prohibits federal savings and loan associations from granting home mortgage loans which run beyond a thirty-year period. 12 C.F.R. sec. 541.14(a) prohibits any increase in the amount of a periodic payment after the initial payment. Accordingly, it is clear that First Federal could not collect the additional interest due under its interest-escalation clause by extending the term of the note, which was already at thirty years, or by increasing the monthly payments. Instead, First Federal has devised a scheme whereby a larger portion of the monthly payment of $376.57 per

month is to be allocated to interest during the first twenty years or so of the loan; and then during the latter years of the loan term, the interest rate is to be sharply reduced so that a greater proportion of each monthly payment then would be allocated to the payment of principal.

The correspondence of the Federal Home Loan Bank Board refers to this manipulation of payments as "unique." The trial court found that First Federal's intention was to apply the payments at the rate of 8 percent until April 1, 1985, and then to reduce the rate to $5\frac{1}{8}$ percent until the retirement of the loan at the end of the thirty-year period. Were the loan to run for the thirty-year period, under First Federal's proposed scheme the total interest payments would equal those originally to have been paid at $7\frac{1}{4}$ percent interest for the thirty-year period. Therefore, Federal Savings and Loan has conceded that for the entire term of the mortgage it cannot manipulate the payments so that the charge will exceed the $7\frac{1}{4}$ percent originally agreed upon. For a full thirty-year-term mortgage loan, then, First Federal is no better off in terms of total interest revenue. However, First Federal's scheme accommodates the present circumstances where the current price of money has substantially increased.

The Beals object to the proposed procedure because the allocation of a greater interest figure out of each monthly payment reduces the rate of the Beals' accumulation of equity in the property. They argue—and their position is not contradicted by First Federal—that few long term mortgage loans run their entire course and that the original borrower is very likely to sell the property at a period far short of the originally scheduled thirty years. This, the Beals contend, means that, if they were to sell their property at any time short of the full term of the mortgage, First Federal's scheme would substantially reduce their accumulation of equity and would

result in a less advantageous financial position for the Beals upon the sale of the property.

On the basis of these allegations and on the basis of the Beals' rationale, Diane and Richard Beal brought an action for declaratory judgment to determine the propriety of First Federal's action, for an injunction to roll back the interest rate to 7¼ percent effective October 1, 1973, and for an order prohibiting First Federal from increasing the interest rate during the term of the loan. They also asserted the failure of First Federal to comply with the federal Truth in Lending disclosure requirements (15 U.S.C.S. secs. 1601 et seq.) and sought actual and statutory damages. They also asserted that First Federal's method of collecting interest was in wanton disregard of the federal regulations and of their rights as borrowers and asked for punitive damages. First Federal demurred to all of the causes of action asserted by the Beals.

The order of the court sustained the defendant's demurrer on the ground that each of the causes of action alleged failed to state sufficient facts to constitute a cause of action. The appeal is only from the portions of the order which sustained the demurrers to the first and third causes of action. The first cause of action related to whether First Federal could increase the interest rates pursuant to the interest-escalation clause when the loan period was already at the thirty-year maximum. The third cause of action was in respect to the plaintiffs' claim for damages for an alleged violation of the federal Truth in Lending disclosure requirements. We conclude that the trial court erred in respect to both causes of action.

In respect to the first cause of action, the plaintiffs and the savings and loan association both acknowledge that 12 C.F.R. sec. 541.14(a) is substantially dispositive of the case. That regulation, promulgated by the Federal Home Loan Bank Board, defines "installment loan"

"The term 'installment loan' means any loan repayable in regular periodic payments sufficient to retire the debt, interest and principal, within the loan term. However . . . no required payment after the first payment shall be more, but may be less, than any preceding payment."

An additional regulation which is important in the context of this particular case is 12 C.F.R. sec. 545.6–1(a)(1). This regulation requires that real estate loans on homes must be made repayable within thirty years. The effect of this regulation on the fact situation here is that the additional interest claimed cannot be collected by extending the term of the loan.

The Beals' argument is predicated upon their interpretation of 12 C.F.R. sec. 541.14(a). They argue that the phrase, "regular periodic payments sufficient to retire the debt, interest and principal, within the loan term," means that *any* amortization schedule used for the allocation of principal and interest must in itself be sufficient to insure the retirement of the debt within the loan period—in the instant case, within thirty years. They argue, therefore, that the present payments being exacted by the savings and loan association, in which 8 percent interest is charged, result in an amortization schedule which would not pay off or retire the loan within the thirty-year period.

Although the Beals acknowledge that the proposed eventual sharp reduction in the interest allocation to a rate of $5\frac{1}{8}$ percent will enable the entire debt to be retired within the thirty-year period, they argue this is unfair, because it delays the build-up of equity in the real estate and unduly penalizes an original mortgagor borrower. They point out that the evil in this arrangement is similar to that in the outlawed and pernicious practice of requiring balloon payments, by which initial payments are made to appear reasonable but are used primarily for the payment of interest and eventually subject the bor-

rower to huge terminal payments if he wishes to maintain his ownership of the property.

First Federal's position is simply that the regular monthly payments have remained the same, that it was not intended to extend the loan term beyond the thirty-year maximum, and that the formula which they propose to use would result in the identical total interest payment over the thirty-year period. Clearly, First Federal's argument does not take into consideration the Beals' position that the interest and payment methods as manipulated by First Federal postpone the accumulation of owner's equity until very late in the loan term. Nor does First Federal's argument really address the question of whether each amortization schedule employed during the course of the loan must be sufficient to pay off the loan within the loan period. First Federal simply argues that the regulations do not require that each and every amortization schedule employed at various times during the course of a loan be sufficient for that purpose. Rather, it asserts all that is required is that amortization schedules be so determined at various times that the loan is retired at the appropriate time even though any one of the amortization schedules employed during the interim would not meet that requirement. Hence, First Federal argues that, because in the latter years of the loan term, interest would be sharply cut and the amount allocated to principal would be greatly increased, it is immaterial that, during the early years of the loan, equity in the owners is not being built up at a constant rate.

It is apparent from the language of sec. 541.14(a) that the meaning of the terms employed therein are indeed subject to differing interpretations. The law to be applied to the interpretation of a regulation under the circumstances before us is, however, absolutely clear. Sec. 541.14(a) is a regulation promulgated at the in-

stance of the Federal Home Loan Bank Board. It is black-letter law that the interpretation by an administrative agency of its own regulation is entitled to controlling weight unless inconsistent with the language of the regulation or clearly erroneous. *Udall v. Tallman,* 380 U.S. 1, 16; *Kupiec v. Republic Federal Savings and Loan Association,* 512 F.2d 147, 151 (7th Cir. 1975); *Michals v. Federal Savings and Loan Insurance Corp.,* 413 F.2d 144, 147 (7th Cir. 1969). In *Udall v. Tallman,* the United States Supreme Court stated, *supra* at 16–7:

" '[T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.' "

While the regulation, sec. 541.14(a), is not completely free of ambiguity, it is impossible to say that the interpretation urged by the Beals is plainly erroneous or inconsistent with the regulation itself. More important, as the opinions cited above demonstrate, is the administrative interpretation placed upon the regulation by the very agency which promulgated it. The trial judge recognized this rule but found that there was not a consistent agency position on the interpretation of sec. 541.14(a). This finding must be set aside because it is contrary to the great weight and clear preponderance of the evidence.

The record demonstrates that, but with a single exception, the agency consistently and without variation has interpreted the phrase, "regular periodic payments sufficient to retire the debt," to mean that any schedule of monthly payments utilized by a savings and loan association must be based on a standard amortization schedule which will assure the retirement of a loan within the period contemplated by the parties.

It should be noted that neither party to this lawsuit asserts that interest-escalation clauses are *per se* prohibited. Rather, it is the assertion of the Beals that, where the loan period is already at the maximum thirty years, the regulations prohibit a variation in interest allocation which will enable a savings and loan association to escalate interest. The interpretations of the regulation are therefore directed not to the question of whether under some circumstances interest can be escalated but whether, where a loan is already at the maximum period, any interest escalation can be permitted.

The plaintiffs have provided in the record numerous memoranda and letters which demonstrate the uniformity of the board's interpretation.

In a letter from General Counsel Charles E. Allen to Congressman Les Aspin, dated December 26, 1973, referring to the effect of sec. 541.14 on interest-escalation clauses, the General Counsel stated:

"[T]he above provision has significantly limited the use of the escalator clause by federally chartered associations. For example, if the loan were made for the maximum permissible term authorized under Board regulations, the escalator clause could not be involved. If the loan term were 25 years and the applicable maximum permissible term were 30 years (as it is for home loans), regardless of the number of years elapsed since the mortgage was executed, the term could be extended only for another 5 years. Further, under sec. 541.14, the total monthly payment could not be increased."

In a memorandum from Director Sprague of the Federal Home Loan Bank Board's Office of Examinations and Supervision dated February 12, 1974 (Memorandum T-56), he stated, in respect to loans made on or after April 10, 1972, that federal regulation 541.14(a) expressly prohibited any monthly payment of principal or interest which exceeded any preceding payment. Moreover, he stated that, in respect to such loans:

"Federal associations exercising their rights under such clauses [interest escalation], may *only* extend the maturity of the loan up to the maximum term permissible for the type of loan involved to the extent necessary to absorb the increase in interest rate, provided that the monthly payment (or principal and interest) is not increased."

A letter to counsel for plaintiffs from the office of the General Counsel of the Federal Home Loan Bank Board dated June 10, 1974, referred specifically to the practice employed by First Federal in the instant case. In appraising the procedures contemplated by First Federal, Associate General Counsel Jerome S. Plapinger stated:

"In our view, the use of the word 'regular' in the phrase 'regular periodic payments' indicates that payments based upon the standard amortization tables were intended. The manipulation of the principal and interest payments described above was clearly not contemplated, and would be a violation of sec. 541.14."

A letter to United States Senator William Proxmire from Chairman Thomas R. Bomar of the Federal Home Loan Bank Board dated June 26, 1974, gave the same interpretation in respect to interest acceleration clauses. Chairman Bomar stated:

"Since the Board's current regulations require that the monthly payments on a home loan may not be increased, the only way to implement an interest increase is to extend the length of the loan. If the original loan term is 30 years, the interest rate cannot be increased at all."

The General Counsel's office affirmed these interpretations in a letter dated September 20, 1974, and addressed to counsel for First Federal. The only apparent exception to the otherwise unanimous expression of official board view unfavorable to First Federal is a letter dated November 4, 1974, from Supervisory Agent Schlosser to the

President of First Federal. This letter cautions First Federal that it must be mindful of the restrictions of Memorandum T–56 dated February 12, 1974, which memorandum on its face makes First Federal's contemplated practice violative of the memorandum's position, but the letter also inexplicably states:

"Therefore, in connection with those inquiries that have previously been considered by this office, and as to the general rate increase procedure followed last year, we find no basis for supervisory objection to the procedures followed."

This statement, on which the trial court placed particular reliance, we find so vague as to be almost irrelevant. Agent Schlosser defined neither "general rate increase procedure" nor "supervisory objection." One thing that Agent Schlosser's letter does make clear, however, is that the procedures contemplated by First Federal are subject to the restrictions of Memorandum T–56. It is apparent that the plain language of that memorandum declares the procedures of the type employed by First Federal in the instant case to be violative of the regulation.

Moreover, subsequent to the order of the trial court in the instant case, the Federal Home Loan Bank Board by formal order and resolution specifically disavowed Agent Schlosser's interpretation that the practices of First Federal were not objectionable and specifically reaffirmed the legal position of its general counsel that:

"[C]ertain practices of First Federal Savings and Loan Association of Madison, Wisconsin (First Federal), respecting interest adjustment or escalation clauses, were violative of the provisions of [12 C.F.R. 541.14(a)]."

Accordingly, it is clear that the official administrative position of the Federal Home Loan Bank Board is that First Federal's action is prohibited by the regulations because First Federal in an effort to implement its rights

under the escalated-interest clause of its note and mort-
gage, has applied amortization tables which individually
did not insure the payment of the loan within the term
set by the agreement of the parties. It is also apparent
that, as so interpreted, the regulation prohibits any
escalation of interest in a mortgage loan which has al-
ready been set at the maximum term of thirty years,
because under the regulation the mortgagee is foreclosed
from increasing the monthly payments and cannot extend
the term of the mortgage.

We recognize, of course, the rationale of the trial judge
that to so hold may in the long run be disadvantageous to
borrowers because it will make savings and loan associa-
tions reluctant to extend credit for the maximum permis-
sible period and, rather, will encourage shorter term
credit because such loans can be extended to give effect
to escalation clauses.

In this case, however, neither this court nor the trial
court can make its decision on the basis of public policy.
Public policy is determined by the legislatively authorized
regulations of the Federal Home Loan Bank Board, and
we are bound by the Board's interpretations of those
regulations unless they are clearly erroneous. The
fact that the Board's interpretation in some cir-
cumstances may be contrary to an aspect of public
policy does not mean that the interpretation is in
error. Rather, the trial court erred when it concluded
that the Board's interpretation was erroneous because
the Board interpreted its own regulation in a manner
contrary to the trial court's concept of public policy.

While the meaning of the regulation is not free from
doubt, we have been offered no reason to conclude that
the Board's interpretation is clearly erroneous. The mere
fact that, generally, a savings and loan association has
the "power to do all things reasonably incident to the

accomplishment of its express objects and the performance of its express powers," does not authorize an individual savings and loan association to override, under such charter powers, regulations which have been reasonably interpreted by the agency to prohibit the procedures First Federal seeks to employ.

Moreover, nothing in the regulations presently before the court *per se* inhibit the right of a savings and loan association to escalate mortgage interest rates generally. It is only under the circumstances here, where the loan is already at a maximum term, that there is any inhibition.

It should also be pointed out that the record demonstrates, by the inclusion of excerpts from the *Federal Register* Vol. 40, No. 32, Friday, February 14, 1975, that the Federal Home Loan Bank Board has subsequently proposed a revision of parts of 12 C.F.R. sec. 541 because the regulation in effect—the one which governs the disposition of this case—prohibited an increase in interest rates where the loan term was at the maximum of thirty years. Hence, it is apparent that the Federal Home Loan Bank Board sought to solve First Federal's problem not by a changed interpretation of the existing regulations but rather by an amendment to the rules which would enable associations to pay more competitive rates on savings accounts and which would reduce the extent to which savers and new borrowers were compelled to subsidize the lower rates paid by existing borrowers.

It is apparent, therefore, that the Federal Home Loan Bank Board is fully aware of the problem faced by savings and loan associations, including First Federal, but it also recognizes that the problem can be alleviated only by amendment to the regulations for prospective operation and cannot be alleviated by indulging in the manipulative practices urged by First Federal.

Accordingly, we conclude that the trial court's order sustaining the defendant's demurrer to the first cause

of action must be reversed, and the cause remanded for trial and disposition on the merits.

The Beals have also appealed from the order dismissing the third cause of action. That cause of action is based on First Federal's alleged violation of regulations under the federal Truth in Lending Act, 15 U.S.C. sec. 1601 et seq. The Beals allege that at no time prior to the time when the variable-interest clause in the mortgage was invoked did the defendant satisfy the disclosure requirements of 12 C.F.R. sec. 226.8(a), (b), and (d). It is also alleged that First Federal violated the Truth in Lending Act and the regulations promulgated pursuant thereto when it failed to issue a formal disclosure statement prior to raising the interest rate. We conclude that the facts alleged are sufficient to state a cause of action in respect to non-disclosure, and therefore we reverse the order of the trial court that sustained First Federal's demurrer.

The third cause of action of the complaint should be viewed in its factual and procedural context. To recapitulate the facts: The Beals on April 21, 1973, made an offer to purchase the house and lot and agreed to assume the existing mortgage, which they believed carried an interest rate of $7\frac{1}{4}$ percent. The offer was accepted by Cherokee Park, and on May 18, 1973, the property was deeded to the Beals by a conveyance which recited that the grantees agreed to assume the pre-existing mortgage to First Federal.

On August 3, 1973, the Beals executed an assumption agreement with First Federal, by which they assumed the obligations of Cherokee Park to First Federal. The Beals entered into this agreement in the belief that the interest rate was fixed at $7\frac{1}{4}$ percent for the entire thirty-year term of the loan. They assert that they would not have executed the assumption agreement if it had been disclosed to them that the note and mortgage they assumed carried a variable-interest provision.

No disclosure of the underlying escalation clause was made at the time the Beals and First Federal dealt with each other at the time of the assumption agreement on August 3, 1973. After this transaction, however, First Federal could not reasonably assert that it did not have knowledge of the creditor-debtor relationship between it and the Beals.

There well might have been a breach of First Federal's duties to disclose at this juncture. On this appeal, however, we are foreclosed from making inquiry into the obligation of First Federal at the time of the August 3 assumption transaction, because the second cause of action of the complaint, relating to the duty to disclose prior to the assumption agreement, was decided in favor of First Federal in the decision on demurrer. That cause of action was dismissed, and the plaintiffs have not appealed from that order. Accordingly, it is the law of this case, whether decided rightly or wrongly by the trial court, that the Beals did not plead sufficient facts to state a cause of action in respect to failure to disclose prior to or at the time the assumption agreement was executed.

The order sustaining the demurrer to the third cause of action was, however, appealed. That cause alleged a violation of the duty to disclose prior to invoking the escalated-interest rates on October 1, 1973. The plaintiffs' complaint acknowledged that First Federal sent a letter dated September 21, 1973, stating that the interest would be increased, but it is alleged that no sufficient disclosure was thereby made. The question regarding the duty to make a disclosure and the possible breach thereof by First Federal stems from the actual increase of the interest rate on or about October 1, 1973. The Beals assert, and the defendant does not dispute, that it was not until the letter of September 21 that the Beals knew of the existence of the interest-escalation provision in the obligation they had assumed.

We conclude that a statutorily complete disclosure statement should have been presented to the Beals prior to the escalation of the interest rate, and we conclude the September 21 letter was inadequate to comply with the disclosure requirements.

Irrespective of the trial court's decision in respect to the second cause of action (the duty to disclose prior to execution of the August 3, 1973, assumption agreement), the record demonstrates that no disclosure was made prior to the submission of an adequate, but clearly untimely, disclosure statement submitted by First Federal on November 7, 1973.

In general, in accordance with 12 C.F.R. sec. 226.6 (a), disclosures are to be made:

". . . clearly, conspicuously, in meaningful sequence, in accordance with the further requirements of this section, and at the time and in the terminology prescribed in applicable sections."

By sec. 226.2 (x) the term in the regulation, "open end credit," does not apply to open end real estate mortgages. Hence, the disclosure requirements of sec. 226.8 which apply to credit transactions "other than open end" govern the requirements of the instant case. That section provides:

"Sec. 226.8 Credit other than open end—specific disclosures

"(a) *General rule.* Any creditor when extending credit other than open end credit shall, in accordance with sec. 226.6 and to the extent applicable, make the disclosures required by this section with respect to any transaction consummated on or after July 1, 1969. Except as provided in paragraphs (g) and (h) of this section, such disclosures shall be made before the transaction is consummated. At the time disclosures are made, the creditor shall furnish the customer with a duplicate of the instrument or a statement by which the required disclosures are made and on which the creditor is

identified. All of the disclosures shall be made together on either.

"(1) The note or other instrument evidencing the obligation on the same side of the page and above or adjacent to the place for the customer's signature; or

"(2) One side of a separate statement which identifies the transaction."

Sec. 226.8(j) considers when disclosure must be made where there is a new transaction, an increase in the obligation, or a refinancing:

"(j) *Refinancing, consolidating, or increasing.* If any existing extension of credit is refinanced, or two or more existing extensions of credit are consolidated, or an existing obligation is increased, such transaction shall be considered a new transaction subject to the disclosure requirements of this part. For the purpose of such disclosure, any unearned portion of the finance charge which is not credited to the existing obligation shall be added to the new finance charge and shall not be included in the new amount financed. Any increase in an existing obligation to reimburse the creditor for undertaking the customer's obligation in perfecting, protecting or preserving the security shall not be considered a new transaction subject to this part. Any advance for agricultural purposes made under an open end real estate mortgage or similiar lien shall not be considered a new transaction subject to the disclosure requirements of this section, provided:

"(1) The maturity of the advance does not exceed 2 years;

"(2) No increase is made in the annual percentage rate previously disclosed; and

"(3) All disclosures required by this part were made at the time the security interest was acquired by the creditor or at any time prior to the first advance made on or following the effective date of this part."

Sec. 226.810, which is an interpretation of the regulations, is an authoritative declaration of how disclosure requirements are to be made effective under circumstances found in the present case. That interpretation states:

"Sec. 226.810 Disclosures—variable interest rates

"(a) In some cases a note, contract, or other instrument evidencing an obligation provides for prospective changes in the annual percentage rate or otherwise provides for prospective variation in the rate. The question arises as to what disclosures must be made under these circumstances when it is not known at the time of consummation of the transaction whether such change will occur or the date or amount of change.

"(b) In such cases, the creditor shall make all disclosures on the basis of the rate in effect at the time of consummation of the transaction and shall also disclose the variable feature.

"(c) If disclosure is made prior to the consummation of the transaction that the annual percentage rate is prospectively subject to change, the conditions under which such rate may be changed, and, if applicable, the maximum and minimum limits of such rate stipulated in the note, contract, or other instrument evidencing the obligation, such subsequent change in the annual percentage rate in accordance with the foregoing disclosures is a subsequent occurrence under sec. 226.6(g) and is not a new transaction."

It is clear that sec. 226.8 was not complied with, for that portion of the regulation provides that all necessary information be included in one document. Although the Beals were shown a copy of the mortgage prior to the execution of the assumption agreement, they were never shown the note which gave the details of the obligation they were assuming. Although it is argued that the Beals had some knowledge of a variable-interest charge, it is established law that even actual knowledge does not satisfy the obligation to disclose under the federal act. Substantial compliance with the disclosure provisions does not exonerate a creditor from its responsibility. Disclosure requirements must be strictly and explicitly adhered to. *Gilbert v. Wood Acceptance Co.*, 486 F.2d 627 (7th Cir., 1973) ; *Mirabal v. General Motors Acceptance Corp.*, 537 F.2d 871, 878 (7th Cir., 1976).

The trial court erred when it concluded that substantial compliance would satisfy the Act. Under the disclosure provisions of the Truth in Lending Act, the common law rule of *caveat emptor* has become the rule of *caveat vendor*. *Mirabal, supra* at 878.

If a disclosure was required, it is clear that no disclosure was made by First Federal.

We conclude that it is a reasonable interpretation of sec. 226.8(j) to conclude that it requires a disclosure when interest is to be increased under a variable-interest clause.

That regulation sets out that the increase of an existing obligation—certainly the escalation of the interest rate is ordinarily that—is to be considered a new transaction and, hence, under the same regulation, subject to disclosure.

Moreover, sec. 226.810 explains the disclosures to be made when variable-interest rates are involved. If a disclosure that the rates of interest are variable is made prior to the consummation of the transaction, no subsequent disclosure need be made, but "when it is not known at the time of consummation of the transaction" whether a change in the interest rates will occur, "the creditor shall make all disclosures on the basis of the rate in effect at the time of consummation of the transaction and shall also disclose the variable feature."

Accordingly, we hold that sec. 226.8(j) applied to make disclosure necessary when the interest on the mortgage loan was raised pursuant to the variable-rate clause, and that this requirement was triggered at that time because First Federal did not make, as set forth in sec. 226.810, disclosure at the time of the consummation of the initial transaction (the assumption of the mortgage).

■

This holding comports with the literal requirements of the regulation and is consistent with the reasonable interpretation as set forth in sec. 226.810. The law is clear that only literal, not substantial, compliance will discharge the creditor's duty, and there is no assertion that literal compliance was afforded by any conduct of the creditor.

If the facts alleged by plaintiffs can be supported by evidence at trial, First Federal violated the Truth in Lending Act and Regulation Z when it failed to issue a formal disclosure statement to the Beals prior to raising the interest rate. The order sustaining defendant's demurrer as to the third cause of action is reversed, the demurrer is overruled, and the cause is remanded for trial.

■

15 U.S.C. sec. 1640(a) provides that a creditor who fails to make the required disclosure is liable for actual damages, plus twice the amount of the finance charge, up to a maximum of $1,000 plus attorney's fees. Clearly, this section contemplates and sanctions a private cause of action.

Crucial to maintenance of the plaintiffs' second cause of action is whether a private cause of action is permitted for the enforcement of compliance with 12 C.F.R. sec. 541.14(a).

■

The standards for implying a private cause of action under federal law are set forth in *Cort v. Ash,* 422 U.S. 66, 78 (1975):

"First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' . . . (emphasis supplied)—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it

consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . . And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? . . . ."

Sec. 541.14(a) is a regulation designed to protect borrowers, a class to which the Beals belong.[1] Moreover, in *City Federal Savings and Loan Assn. v. Crowley,* 393 F. Supp. 644 (E.D. Wis., 1975), the court stated that there was no evidence that Congress intended to withhold a private cause of action and that such private action would not be inconsistent with the pervasive legislative scheme governing the relationship between the plaintiff class and the defendant class.

This court's decision in *Kaski v. First Federal Savings & Loan Assn. of Madison,* 72 Wis.2d 132, 240 N.W. 2d 367 (1976), recognized that the Board's regulation of federal savings and loan associations is all pervasive. State common law has no application to the asserted cause of action.

We conclude that the Beals' private action for the vindication of a federally afforded right is appropriate. As stated in *Cort v. Ash, supra,* it meets the requirements for such an action.

Additionally, the question is presented whether the doctrine of primary jurisdiction requires a prior administrative determination of the issues raised.

The defendant in its demurrer raised the objection to the first cause of action that plaintiffs failed to "exhaust administrative remedies" before the Federal

---

[1] The entire history of this section, particularly the history which prohibits balloon payments or increased payments, demonstrates the concern of the Act for the right or borrowers to build up equity on a regular and methodical basis.

Home Loan Bank Board. The trial court noted this argument in its discretion but never addressed it, apparently because it found no violation of the regulation under the facts as pleaded. The issue was one of primary jurisdiction, not exhaustion. The distinction is that exhaustion relates to judicial review of incomplete administrative proceedings, while the primary-jurisdiction rule is applicable, as in the instant case, when there has been no institution of formal agency proceedings. *Nodell Investment Corp. v. Glendale*, 78 Wis.2d 416, 427 N. 13, 254 N.W.2d 310 (1977) ; *Wisconsin Collectors Association, Inc., v. Thorp Finance Corp.*, 32 Wis.2d 36, 47, 145 N.W.2d 33 (1966).

The primary-jurisdiction rule is not concerned with subject-matter jurisdiction, and it "arises only in cases where there is concurrent jurisdiction in the administrative agency and in the courts." *Browne v. Milwaukee Board of School Directors*, 69 Wis.2d 169, 175, 230 N.W.2d 704 (1975). The question of primary jurisdiction does not arise until there has been a finding of subject-matter jurisdiction. In the instant case, therefore, it was necessary on this appeal to reach the merits of whether the facts alleged constituted a violation of the regulation and whether a private cause of action existed before reaching the question of primary jurisdiction.

Because we have found there to be a cause of action based on a violation of 12 C.F.R. sec. 541.14(a) and subject-matter jurisdiction in the Board and the courts, the trial court must face the question whether in its discretion the matter should be referred to the agency for initial consideration.

The primary-jurisdiction rule is invoked to promote proper relations between the courts and administrative agencies. *Wisconsin Collectors Association, Inc., v. Thorp Finance Corp., supra* at 44; *Sawejka v. Morgan*, 56

Wis.2d 70, 79–80, 201 N.W.2d 528 (1972). Agencies are recognized as having a special role in fact-finding and policy-making in the field of their expertise. *Thorp* at 45; *Sawejka* at 80. Where those considerations are paramount, the agency should be given the first review unless there is some valid reason for the court to intervene and exercise its jurisdiction. *Sawejka* at 80; *Browne v. Milwaukee Board of School Directors, supra* at 176. The primary-jurisdiction rule serves to promote comity and the interests of judicial administration. *Id.* at 175.

The most common reason for deferring to an agency is that issues of fact and application of fact to law are involved. *Browne v. Milwaukee Board of School Directors,* 83 Wis.2d 316, 333, 265 N.W.2d 559 (1978); *Kaski v. First Federal Savings and Loan Association of Madison,* 72 Wis.2d 132, 144, 240 N.W.2d 367 (1976). Where issues of law are paramount, a decision to exercise the court's subject-matter jurisdiction is proper. *State v. Dairyland Power Cooperative,* 52 Wis.2d 45, 56, 187 N.W.2d 878 (1971).

Because this case is on appeal from an order sustaining the demurrer, which order we reverse, the case must be remanded for trial. Some factual issues remain, though they do not appear to be complex or even necessarily disputed. The trial court did not reach the question of primary jurisdiction, because it found no cause of action and thus no subject-matter jurisdiction.

Because we find that the first cause of action, relating to 12 C.F.R. 541.14(a), states a cause of action, the trial court on remand may elect to determine the question of primary jurisdiction. However, as we view the case in its present posture on appeal, the cause of action presents not factual matters particularly within the expertise of the administrative agency, but rather

legal matters that are within the expertise of the courts, state and federal.

We also note that the remaining cause of action, which we have in this opinion held to be sufficient to withstand demurrer, is a private action for the vindication of a private right. This cause of action would only be enforceable in a court.

The two causes of action have a nexus in the same mortgage transaction. It would appear to be contrary to principles of judicial economy to continue the cause of action for the alleged Truth in Lending Act violation in the trial court, while ceding primary jurisdiction to the agency in respect to sec. 541.14(a). Because the two causes of action have a common factual basis, the trial court may well conclude that interest in the efficient administration of justice requires that both causes of action in any event be tried together.

*By the Court.*—Order sustaining demurrers reversed, and cause remanded for further proceedings not inconsistent with this opinion.

ABRAHAMSON, J., took no part.