In the Matter of the Application to Transfer Mining Permit No. 416 from HOMESTAKE MINING COMPANY to Minerva Explorations, Inc.

Nos. 17262, 17271.

Supreme Court of South Dakota.

Argued March 18, 1991.

Decided June 26, 1991.

Roger A. Tellinghuisen, Atty. Gen., Wade A. Hubbard, Asst. Atty. Gen., Pierre, Lawrence L. Piersol, Sioux Falls, for appellant.

Marvin D. Truhe, Rapid City, for appellee.

WUEST, Justice.

In November 1984, Homestake obtained Mining Permit No. 416 to mine precious metals (e.g. gold) at a site known as the Ragged Top Project near Spearfish Canyon in Lawrence County, South Dakota. Homestake posted a surety bond in the amount of $661,800 to cover the cost of reclamation after anticipated mining activities at the site were completed. Homestake estimated its mining operations would be completed by 1988 or 1989.

Homestake conducted mining exploration and reclamation activities at the site in 1984; however, Homestake never commenced any mining operations at the site.[1] From 1984 to 1988, Homestake filed with the South Dakota Department of Water and Natural Resources (Department) an annual report indicating that no surface disturbance had occurred.[2] Due to economic and other factors, Homestake discontinued its plan to commence mining under the permit. On February 22, 1989, Homestake requested the Department release the reclamation surety bond pursuant to Permit No. 416 on condition the permit remain "active" and a new surety be posted before any mining activities were conducted.

The Department and the Board of Minerals and Environment (Board) consented to release Homestake's surety bond but not Homestake's liability for reclamation. On April 20, 1989, the Board executed a Release of Surety which, unlike the Board's standard release, did not release Homestake from liability for reclamation under the permit. The release explicitly provided that "Permit No. 416 is to remain active with the condition that Homestake post the required surety prior to conducting any activity under the permit."

In May 1989, Homestake and Minerva Explorations, Inc. (Minerva), a Nevada corporation, requested the permit be transferred to Minerva. Minerva had acquired an interest in Permit No. 416 and the Ragged

---

1. South Dakota law distinguishes mining exploration and mining operations. *Cf.* SDCL ch. 45–6C Mineral Exploration with SDCL ch. 45–6B Mined Land Reclamation. A "mining operation" is the "development or extraction of a mineral from its natural occurrence" and does not include "exploration activities." SDCL 45–6B–3(9). An "exploration operation" is "the act of searching for or investigating a mineral deposit." SDCL 45–6C–3(6). A permit is required for mining operations, SDCL 45–6B–5, but is not required for exploration activities, SDCL 45–6C–4.

2. SDCL 45–6B–36 provides in pertinent part:

Within sixty days prior to the anniversary date of the permit each year, the operator shall submit a map ... showing the reclamation accomplished and any deviations from the originally approved operating and reclamation plans[.]

Top Project from Homestake in 1986. Minerva filed with the Department a Notice of Transfer required by SDCL 45–6B–47 and ARSD 74:29:04, set forth *infra*. Minerva did not submit a reclamation surety with the Notice of Transfer.

The Department reviewed the request, found it procedurally complete and recommended approval of the transfer on condition that Minerva submit a reclamation surety prior to commencing mining. The matter was heard before the Board, which treated the matter as a contested case. Mr. Richard Fort (Fort) intervened at the hearing as an interested party.

Notwithstanding its April 20th Release of Surety, the Board determined that Permit No. 416 had expired, and therefore, there was no permit in existence to transfer. The Board also determined that Minerva's application did not comply with ARSD 74:29:04, which requires the filing of a replacement surety with a Notice of Transfer.

Minerva appealed to circuit court, which reversed and remanded the Board's decision. The State (an amalgamation of the Board and Department) and Fort each appeal the circuit court's decision to this court. We have consolidated their appeals and address the following issues:

I. Whether the Board erred in determining that Permit No. 416 had expired and therefore could not be transferred; and

II. Whether the Board erred in denying the permit transfer on the basis that Minerva did not submit a surety bond with its Notice of Transfer.

## I.

■ The State and Fort rely upon the conclusion of the Board that Homestake's permit had expired and therefore could not be transferred. Minerva contends the Board's conclusion is without legal authority and is unsupported by the Board's findings of fact.

Mining permits authorize mine operators to engage in mining activities for the life of the mine. SDCL 45–6B–5. A "life of the mine permit" is in effect as long as:

(a) An operator continues to engage in the extraction of minerals;

(b) Mineral reserves are shown to remain in the mining operation and the operator temporarily ceases production;

(c) Production is resumed within five years of the date production ended.

SDCL 45–6B–3(6)(a)–(c).

Fort and the State argue that Permit No. 416 does not meet any of the requirements of SDCL 45–6B–3(6) and therefore cannot be an effective "life of the mine permit." It is undisputed that Homestake never engaged in the extraction of minerals at the permit site. Thus, it logically follows that Homestake could not "continue to engage in," "temporarily cease," or "resume" mineral production within the provisions of SDCL 45–6B–3(6). However, the fact that Permit No. 416 does not fit neatly within the statute does not render the permit invalid. It would be anomalous, indeed, to find a permit issued yesterday invalid today because its owner had not yet begun mining operations. Under Fort's and State's argument, mining permits would be invalid the moment they were issued. The Board's administrative rules provide that a mining operation is not in a state of temporary cessation under SDCL 45–6B–3(6)(b) when the mining permit has been issued, but the mining operation has not begun. ARSD 74:29:09:01(3). The clear implication is that mining permits "exist" after issuance, but before mining operations commence. There is no significant statutory or administrative provision to the contrary, and we reject this argument.

■ At the hearing, the Board discussed the definition of the term "life of the mine." Apparently, the Board determined the term not only refers to the time when all valuable mineral deposits have been extracted, but also includes the permit holder's intention to extract such minerals. Under this reasoning, the Board determined that Homestake's delay in beginning mining operations, its reclamation of the exploration activities, and the release of the surety bond all evidenced Homestake's in-

tention to not mine under Permit No. 416. Accordingly, the permit "expired" or "lapsed."

We have gleaned the preceding facts and rationale from the transcript of the hearing and the appellate briefs. The Board's findings of fact, however, are almost completely devoid of any reference to Homestake's intentions and the relevance of those intentions to the conclusion that Permit No. 416 had expired. For all practical purposes, there are no findings which support this conclusion. The failure to enter proper findings is reversible error. *See* SDCL 15–6–52(a); *Olson v. Olson*, 438 N.W.2d 544 (S.D.1989); *Talbert v. Talbert*, 290 N.W.2d 862 (S.D.1980).

However, we refrain from remanding to the Board for findings in this instance because a review of the entire record does not support an inference that Homestake intended its permit to expire. First, Homestake arranged for the transfer of Permit No. 416 and the release of the reclamation surety before expiration of the estimated completion date of the mining project (1989). Second, and more compelling, in seeking the release of the reclamation surety, Homestake specifically requested that Permit No. 416 remain "active." Clearly, Homestake never intended the permit to expire; they intended to transfer it. The Board found as fact that Homestake's surety had been released "with the condition that [the permit] remain 'active.'" Any conclusion to the contrary is unsupported in the findings and in the record. We hold that Homestake's permit did not lapse or expire, but was in effect and subject to transfer.

## II.

■ Pursuant to Homestake's and Minerva's Notice of Transfer, the Department informed Minerva that it would not have to file a surety bond with its application, but would be required to submit a reclamation surety prior to commencing mining under the permit. The surety required would be $661,800, equivalent to the surety formerly required of Homestake. Accordingly, Minerva did not submit a bond with its transfer application.

■ The Board found both Homestake and Minerva to be in compliance with applicable state, federal and local laws; however, the Board concluded as a matter of law that Minerva's Notice of Transfer was fatally deficient because Minerva failed to file a surety bond.

Pursuant to SDCL 45–6B–47:

Any mining operation permit may be transferred. If one operator succeeds another at any uncompleted operation, he shall make application for a transfer to the board of minerals and environment. *The board may not deny a transfer unless the operation is not in compliance or cannot be brought into compliance with all applicable local, state and federal laws pertaining to the operation prior to the transfer, or unless the successor operator is in violation of state statutes, rules, mining permit conditions or requirements with respect to any mining operation in the state.* The board shall release the first operator from all liability as to that particular reclamation operation and shall release his surety as to such operation if the successor operator assumes, as part of his obligation under this chapter, all liability for the reclamation of the affected land, and his obligation is covered by an appropriate surety as to such affected land[.]

(Emphasis added). The administrative rules adopted in conjunction with this statute provide:

A transferred permit authorizes only those activities approved in the operating and reclamation plan, permit conditions, and approved permit amendments. Any changes in the permit, including adding contiguous land, minor modifications, major modifications, or technical revisions, are subject to the [regulations regarding permit amendments].

ARSD 74:29:04:05. And:

[T]he successor operator accepts all responsibility and liability for the mining operation and the reclamation of all land

affected by the mining operation, as described in the first operator's permit[.] ARSD 74:29:04:02(8). Thus, mining permits are freely transferable and the successor operator takes the permit as it finds it, accepting all rights and liabilities contained therein.

Certain administrative rules specifically address the requirement of a surety in the context of a permit transfer. ARSD 74:29:04:01(3) provides that the successor operator's Notice of Transfer shall include a "replacement surety." And ARSD 74:29:04:06 provides:

> The board shall not release the surety of the first operator until the successor operator submits a replacement surety and the permit transfer application has been approved.

Fort contends the Board erred in releasing Homestake's surety prior to approval of the transfer application, and therefore, Permit No. 416 either became ineffectual or could not be transferred because no surety was in place. However, this error, if it was an error, cannot work to deny the proposed transfer. Pursuant to SDCL 45–6B–47, the Board "may not deny a transfer unless the operation is not in compliance or *cannot be brought into compliance*, with all applicable ... laws." (Emphasis added). If the release of Homestake's surety was erroneous, Homestake could have been brought into compliance by simply filing another surety. Consequently, the permit transfer may not be denied on this basis.

■ ARSD 74:29:04:01(3) provides that a "replacement surety" must be filed with a Notice of Transfer. At the time Minerva filed its Notice, however, there was no surety to replace; the Board in April 1989 reduced Homestake's surety bond to zero dollars. Under the relevant statutes and administrative rules, the transferee takes the permit as it finds it, subject to the same obligations and conditions as the transferor. Consonant with this scheme, the term "replacement surety" may be understood to mean the surety which was in effect at the time Notice of Transfer was filed. *Cf. New Jersey Zinc Co. v. Colorado Mined Land Reclamation Bd.*, 738 P.2d 51 (Colo. App.1987) (similar statutory scheme).

Under such an interpretation, it was error for the Board to deny the transfer based on Minerva's failure to file a surety bond. Since no surety bond was required for mere possession of the permit, no surety bond was required for the mere transfer of possession of the permit. The condition of the permit that a surety bond be filed prior to commencing mining operations applies with equal force against Minerva as it did Homestake. The Board's denial of the transfer on this basis was an error of law. SDCL 1–26–36.

We affirm the decision of the circuit court.

MILLER, C.J., and AMUNDSON, J., concur.

HENDERSON and SABERS, JJ., dissent.

HENDERSON, Justice (dissenting).

## PREFACE

An adverse impact, of great significance, to the ecological system of the Black Hills, results from this decision. If this decision stands, it will blunt the beauty of Spearfish Canyon for vast gold mining efforts will proceed to the very lip of that canyon; a pit will exist approximately one-half mile from the new visitor's center. Spearfish Canyon, since the days of the Dakota Territory, has been a pride of the South Dakota people. It is regarded as one of the most beautiful, peaceful canyons in America. Waterfalls and wildlife abound. Here, an unused mining permit is being used as a commercial commodity, traded for on the open market, for big bucks. This Board, composed of citizens of this state, having all of the evidence before it, is now being reversed by the courts of this state. I cannot live with myself and join this decision, not only because of the future destruction of God's gift to us, but because the statutes of this state, under SDCL ch. 45–6B, envision a greater overall intent and purpose than the majority opinion, by its strict construction, would lead us to be-

lieve. As a vivid illustration, subdivision (6) of SDCL 45–6B–2 implements a balancing test between "diverse socioeconomic impacts" of a mining operation and its "probable beneficial impacts."

## I.

Did the permit expire? Yes. Homestake did not possess "a life of the mine permit" because there was never any mine (this is conceded). SDCL 45–6B–5. Homestake could not, "continue" to "engage in"—"resume"—or "temporarily cease" mining. *The mine was non-existent.* SDCL 45–6B–3(6). Under subdivisions (b) and (c) thereof, an inactivity of mining operations, together with a failure to give notice of cessation is fatal to a "life of the mine permit." Homestake never even began to mine nor did it give notice of a cessation of activities. This evinces an obvious intention not to mine. Homestake saw fit to dress up the land, upon which it had caused superficial injury, on its *exploration activities.* Not mining activities. Homestake failed to attend the July 21, 1989, hearing despite notice. The Board deemed this to be a further indication of intent that Homestake had abandoned the permit. On the record, the Board expressed that they had considered Homestake's intent by its wide advertising concerning the site, as now being a reclaimed area. Obviously, a "reclaimed area" signifies that there are no future mining activities in a planning stage.

## II.

This Board obviously considered, and the courts of this state should consider the people's will, through its representative government. SDCL 45–6B–2, towards the end of that statute, expresses a public policy which should be meaningful to the courts of this state:

The Legislature finds that an increase in the level of activity in the large-scale gold and silver mining industry in the Black Hills may cause or have the potential to cause impacts of unknown scope to competing land uses, the environment and other natural resources. The Legis-

lature further finds that, due to the unknown consequences of such an increase in activity, additional information on the cumulative impacts of mining is needed for making decisions on future permits *or amended permits for large-scale gold* or silver *mining* operations and is necessary prior to the time the board takes *any action* on such permits for acres in excess of the limits established by § 45–6B–83. (emphasis added mine).

This statute was initially passed in 1982. The two sentences set forth above were added in 1989 and then became effective July 1, 1989. It was in effect during the operative facts of this "transfer of ownership." Minerva has admitted that it intends to operate the site and further indicates that it will operate far differently than Homestake's original proposal. Homestake obtained its permit in 1984. Minerva began transfer of ownership concerning the permit in question in the forepart of 1989. Certainly this Board had the rightful, lawful, legislative duty to realistically look into the range of the intense mining activities as proposed by Minerva.

## III.

The agency in question is known as the South Dakota Board of Minerals and Environment. An extensive hearing on the transfer of this mining permit took place on July 20 and 21, 1990. Thereafter, the Board entered written findings of fact and conclusions of law. This Board considered that, under the original permit, Homestake would begin in 1984 and conclude its operation in 1988 or 1989. Homestake took materials from the 122 acre project to its mine at nearby Lead, South Dakota, approximately five miles away, pursuant to its permit. Homestake, with its motherlode of gold, has operated commercially in the Black Hills for at least one century. It is the largest commercial gold mining operation on the North American continent. Minerva is a Nevada mining corporation which is a subsidiary of a Canadian company. Minerva's president lives in Calgary and its business is conducted out of Canada. Herebefore, Minerva has undertaken no mining activities within the State of

South Dakota. Minerva has no mine in the Black Hills anywhere which rivals the sophistication and stability of the Homestake Gold Mine at Lead. This state board is an administrative tribunal with expertise. Our courts, in South Dakota, have no right to make a decision on whether the Board's decision was unwise or would reach a same conclusion. *Application of Jack Rabbit Lines, Inc.*, 283 N.W.2d 402, 405 (S.D.1979). Furthermore, the courts are to give *great* weight to not only the findings of fact by this Board but also to *inferences drawn by the Board* on questions of fact. *Matter of Midwest Motor Express, Inc.*, 431 N.W.2d 160, 162 (S.D.1988). It appears that the circuit court's decision essentially strips the Board of its discretionary power. This Board has general statutory authority over mining permits and the transfer of permits. *See, Application of Livestock State Bank*, 252 N.W.2d 227, 229 (S.D.1977) expressing that the range of agency discretion and power extends beyond powers specified as set forth in governing statutes. This Board has been granted *general authority over mining permits. See*, SDCL 45–6B–5; 45–6B–18; 45–6B–30; 45–6B–33; 45–6B–49; 45–6B–51.

My point is this: The circuit court did not give proper deference to the findings of the Board.

In light of that written above, I cannot take the appellate position that the Board's action was "arbitrary and capricious, was in violation of statutory provisions and was made upon unlawful procedure" as so entered by the circuit court.

Rather, I take the appellate position that Minerva's proposed program for Mining Permit # 416 was a proper consideration by this Board. The Board is not a lifeless, bloodless, bureaucratic conduit to permit transfers from huge mining corporations to one another, for money, so they can ravish the earth. Rather, it is comprised of South Dakota citizens who have the right to examine a mining permit during any event *in its life*. And, particularly, when it is dead on its face, based upon the testimony it hears from live witnesses.

Would not South Dakotans, who serve on this Board, consider the beauty of Spearfish Canyon and compare its splendor to the pocketbook of a Canadian corporation, with no history in this state? The answer is obvious, yes, it would.

Lastly, I agree with Justice Sabers' dissent concerning the surety bond. In the notice of transfer signed by Minerva on April 20, 1989, the President of Minerva acknowledged "that I must provide a surety to cover such reclamation prior to said transfer." Minerva failed to post the required surety. Thus, the Board was authorized to deny the request for a permit transfer. We must zero in on ARSD 74:29:04:01(3) in both interpretation and application to the facts before the Board. Courts are obliged to give deference to the Board in such cases. *Dept. of Health v. Lutheran Hospitals & Homes Society*, 227 Neb. 116, 416 N.W.2d 222, 227 (1987); *Miller v. Civil Constructors*, 373 N.W.2d 115, 117 (Iowa 1985); *Application of Skjonsby Truck Line, Inc.*, 357 N.W.2d 227, 231 (N.D.1934); *Beal v. First Federal Savings & Loan Ass'n.*, 90 Wis.2d 171, 279 N.W.2d 693, 698 (1979); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

I would reverse the circuit court.

SABERS, Justice (dissenting).

It was wrong for Department and Board to consent to release Homestake's surety bond in the amount of $661,800 before a replacement surety was posted. In doing so, the Board executed a "non-standard" Release Of Surety, which, *inconsistently*, "did not release Homestake from liability for reclamation under the permit." The Board thereby brought all this trouble on itself.

SDCL 45–6B–20 provides in part that the Board

shall set the level of the surety necessary to guarantee the costs of reclamation of affected public and private lands. The surety shall be filed or deposited with the board *before* the issuance of the mining permit[.] (Emphasis added).

ARSD 74:29:04:01 further provides that any notice to transfer this mining permit *"shall* include ... [a] replacement surety." (Emphasis added). ARSD 74:29:04:06 prohibits "release [of] the surety of the first operator until the successor operator submits a replacement surety[.]" Taken together, these provisions contradict the majority's conclusion that "[s]ince no surety bond was required for mere possession of the permit, no surety bond was required for the mere transfer of possession of the permit."

The Board should not have released Homestake's surety bond without either: (a) requiring the posting of a sufficient replacement surety bond; or (b) cancelling the permit. To allow a permit to remain "active" without a surety bond is *ad hoc* lawmaking without support in the statutes or the regulations. To now allow this unbonded "permit" to be "transferred" on condition that a replacement bond be filed later compounds the error and further defeats the applicable regulatory scheme.

We should reverse and remand all the way back to the Board of Minerals and Environment with instructions to do this over until it gets it right.