COMMUNITY TITLE CO., et al.,
Plaintiffs-Appellants,

v.

ROOSEVELT FEDERAL SAVINGS &
LOAN ASSOCIATION,
Defendant-Respondent.

Nos. 46578, 46640.

Missouri Court of Appeals,
Eastern District,
Division Eight.

March 20, 1984.

Motion for Rehearing and/or Transfer to
Supreme Court Denied April 27, 1984.

Application to Transfer Denied
June 19, 1984.

Mark G. Arnold, St. Louis, for plaintiffs-appellants.

David G. Millar, St. Louis, for defendant-respondent.

KAROHL, Judge.

Plaintiffs Community Title Company and Chicago Title Insurance Agency brought this action for injunctive relief from defendant Roosevelt Federal Savings and Loan Association's tortious interference with plaintiffs' business relations. Roosevelt counterclaimed, asking for injunctive relief from Community and Chicago's tortious interference with its contracts. After a trial without a jury, the trial court denied each claim and both sides appeal. We affirm the judgment of the trial court denying the requests for injunctions.

Plaintiff Community Title Company performs closing and escrow services in connection with the sale or transfer of real property, in addition to researching titles and writing title insurance policies on behalf of a title insurance company. Plaintiff Chicago Title Insurance Agency, a wholly owned subsidiary of Community, performs similar services on behalf of another title insurance company. Defendant Roosevelt is a savings and loan association chartered by the United States pursuant to the Home Owners Loan Act of 1933, 12 U.S.C. § 1461 et seq. (Supp.1981).

Roosevelt's principal business is that of making loans for the purchase of residen-

tial real estate. Most of Roosevelt's loans, represented by notes secured by deeds of trust, contained repayment terms of thirty years at a fixed rate of interest. The parties stipulated that at the time of trial, the average yield of the portfolio of outstanding loans was 9.595%, and the average remaining time to maturity was approximately twenty-five years. Most of Roosevelt's borrowers sell or convey their homes prior to maturity. The prevailing market rate of interest at the time of the suit was 16 to 19%.

The vast majority of the deeds of trust held by Roosevelt contained "due-on-sale" clauses. Most contained the following provision:

> If all or any part of the Property or an interest therein is sold or transferred by Borrower without Lender's prior written consent, excluding (a) the creation of a lien or encumbrance subordinate to this Deed of Trust, (b) the creation of a purchase money security interest for household appliances, (c) a transfer by devise, descent or by operation of law upon the death of a joint tenant, or (d) the grant of any leasehold interest three years or less not containing an option to purchase, lender may, at lender's option, declare all the sums secured by this Deed of Trust to be immediately due and payable.

As a condition of granting a loan, Roosevelt required borrowers to purchase a policy of title insurance insuring at least the lender's deed of trust. Until the events leading to this litigation, Roosevelt had always accepted both owner's and mortgagee's title insurance policies issued by Community and Chicago.

In late 1979, interest rates on home loans increased dramatically. Roosevelt, like other savings and loans, found itself with a portfolio of low yielding loans. The prevailing high interest rates adversely depressed real estate sales. Thus, title insurance agencies and companies and real estate companies lost a significant source of revenue with declining home sales. Real estate agents were unable to close sales and earn their commissions. As a result,

plaintiffs were not researching titles and selling title insurance policies or closing transactions. Title insurance is normally ordered after a sale and paid for when the transaction is closed, and the premium is related to the sale price. There was testimony at the trial that real estate agents referred almost all of plaintiffs' business.

The problem that the agents and title companies faced was that with the due-on-sale clauses, borrowers would have to pay off the balance of their low interest mortgages when they sold the property, and the new buyer would have to obtain financing at a higher rate of interest. With mortgage interest rates hovering between thirteen and sixteen per cent, however, the added cost became an obstacle to sales. Roosevelt's dilemma, on the other hand was that interest paid out on deposits in addition to the cost of doing business exceeded interest taken in on most of its older, low interest mortgages. The due-on-sale clause was a way of eliminating these low yielding loans as soon as the property was sold, so that it could re-loan the money at current higher rates or negotiate a higher rate in the event the purchaser assumed the existing loan. In either event Roosevelt could also charge additional loan fees.

Faced with the problem of declining sales, a number of realtors requested Community's advice and assistance in the use of the "contract for deed" method of alternative financing and selling homes. A contract for deed is an installment sale, under which the buyer agrees to make payments at a specified rate of interest in installments to the seller. The seller agrees to convey to the buyer a general warranty deed upon completion of the payments. The buyer normally takes possession of the property at the time the contract is made. The purpose of the contract for deed is for the buyer to get the benefit of the seller's existing low interest rate on his mortgage. The only way to complete a successful contract for deed transaction is to conceal it from the mortgage holder, to prevent accel-

eration of the loan under the due-on-sale clause.

In response to the real estate agents' request, Community decided early in 1980 to design a program of documents and services for contract for deed sales. Community designed model contract for deed forms and related documents, which were made available to area real estate agents and brokers. Community also gave presentations and seminars to agents and brokers concerning their contract for deed program, and then actually prepared many individual contracts for deed, charging a fee for closing the sales. After the sale was closed, Community would not inform the existing lender of the transaction.

We note, however, that Chicago never closed any contract for deed transactions, nor does Roosevelt maintain that it did. In Roosevelt's brief, it states, "Community Title is the only title company which has participated in such fashion in sales by contract for deed ...."

In late 1981, Roosevelt became aware that Community had written contracts for deed for some of its borrowers. Roosevelt sent a letter to Community and other title companies, requesting each to provide Roosevelt with information about contracts for deed where Roosevelt held an existing loan. Some title companies, including Community, refused, claiming that the information was confidential.

Roosevelt then wrote to the Federal Home Loan Bank Board, the governing agency of federal savings and loan associations, describing Community's activities and requested advice as to whether Roosevelt could refuse to accept title policies from title companies engaged in contract for deed activities.[1]

The Federal Home Loan Bank Board gave its approval and Roosevelt informed Community that it would no longer accept mortgagee's title binders or policies from Community, until Community ceased its contract for deed activities. Community then had Chicago issue title binders to Roosevelt in place of those rejected by Roosevelt. Roosevelt also rejected the title binders issued by Chicago.

Plaintiffs filed a petition for an injunction alleging tortious interference with their business expectancies. Defendant asserted a counterclaim for an injunction, claiming wrongful interference with its loan contracts. The trial court denied both prayers for injunctions.

■ On appeal, plaintiffs argue: (1) the trial court improperly applied the law to the facts and improperly declared the law in finding that Roosevelt is privileged to do business with whomever it chooses, that Roosevelt's actions were not intentional, and that Roosevelt was privileged to interfere with contracts to protect its legitimate business interests; (2) the trial court erred in finding that injunctive relief was inappropriate; and (3) the trial court's finding that damages were speculative and conjectural was contrary to the evidence. Defendant presented an assortment of defenses, including the affirmative defense of plaintiffs' unclean hands, and that the relief sought was inappropriate. Because we find that the trial court was correct in finding that injunctive relief was inappropriate, we need not address plaintiffs' other points. An appellate court opinion should be limited to those questions essential to proper disposition of the appeal. *State ex rel. Ellsworth Freight Lines, Inc. v. State Tax Commission*, 651 S.W.2d 130, 133 (Mo. banc 1983). In other words, even if plaintiffs proved that Roosevelt tortiously interfered with plaintiffs' business relations by rejecting their title policies, (which we do not decide) the injunctive relief requested was totally inappropriate.

■ Initially, we note that the judgment of the trial court must be affirmed on appeal unless it is unsupported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or ap-

---

**1.** Roosevelt maintains that a contract for deed transaction triggers its right to accelerate the loan under the due-on-sale clause and demand full payment. This is an issue we expressly do not decide.

plies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The judgment may be set aside only with caution and with a firm belief that the decree or judgment is wrong. *Snyder v. Hendrix*, 648 S.W.2d 894, 895 (Mo.App.1983).

■■■■ As a general proposition, injunctive relief is discretionary and does not issue as a matter of right. *Hudson v. School District of Kansas City*, 578 S.W.2d 301, 311 (Mo.App.1979). Injunction is a harsh remedy, to be used sparingly and only in clear cases. *Neaf v. Mallory*, 622 S.W.2d 372, 373 (Mo.App.1981). Relief by way of mandatory injunction is given with more caution than other types of relief. *Hudson*, 578 S.W.2d at 312. In addition, consideration must be given to the injunction's effect upon all. parties in interest, and it should issue only in case it is necessary to protect a substantial right and even then not against great public interest. *Higday v. Nickolaus*, 469 S.W.2d 859, 871 (Mo.App.1971).

Each count of plaintiffs' petition asked for the same injunction. Plaintiffs asked the court to enter an order permanently enjoining and restraining defendant Roosevelt:

(1) from interfering with Community's and [Chicago's] contracts and business expectancies with its customers for owner's and lender's title insurance policies;

(2) from refusing to issue loans to borrowers because the borrower has obtained lender's title insurance from Community Title Insurance Company [or Chicago] unless it reasonably believes that such insurance will provide it insufficient protection because of the financial insecurity of the company issuing the title insurance; and

(3) from refusing to accept policies of lender's title insurance issued by Community Title Insurance Company [or Chicago] in satisfaction of Roosevelt's requirements of lender's title insurance unless it reasonably believes that such in-

surance will provide it insufficient protection because of the financial insecurity of the company issuing the title insurance.[2]

We believe that the requested injunction would require continued supervision and regulation of a federal savings and loan association. Given the overwhelming authority to the effect that federal law and the Federal Home Loan Bank Board exclusively regulates federal savings and loans, the trial court did not abuse its discretion in finding that the relief sought was inappropriate.

■■ Section 5(a) of the Home Owner's Loan Act of 1933, (HOLA) 12 U.S.C. § 1464(a) empowers the Federal Home Loan Bank Board (FHLBB) "under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as Federal savings and loan associations ...." Pursuant to this authorization, the FHLBB has promulgated regulations governing "the powers and operations of every Federal savings and loan association from its cradle to its corporate grave." *Fidelity Federal Savings and Loan Association v. de la Cuesta*, 458 U.S. 141, 145, 102 S.Ct. 3014, 3018, 73 L.Ed.2d 664 (1982), *quoting People v. Coast Federal Savings and Loan Ass'n*, 98 F.Supp. 311, 316 (S.D.Cal.1951). FHLBB regulations have the force and effect of a statute. *City Federal Savings and Loan Ass'n v. Crowley*, 393 F.Supp. 644, 651 (E.D.Wis.1975).

■■■■ The FHLBB's authority to regulate the lending practices of federal savings and loans is virtually limitless given the broad language of § 5(a). *de la Cuesta*, 458 U.S. at 160, 102 S.Ct. at 3026. It would have been difficult for Congress to give the FHLBB a broader mandate. *Glendale Federal Savings & Loan Ass'n v. Fox*, 459 F.Supp. 903, 910 (C.D.Cal.1978). Congress' explicit delegation of jurisdiction over the

---

**2.** No actual damages were prayed for. Plaintiffs alleged that damages were not readily cal-

culable, but they requested punitive damages.

"operation" of savings and loans empowers the Board to issue regulations governing mortgage loan instruments, since mortgages are a central part of any savings and loan's "operation." *de la Cuesta*, 102 S.Ct. at 3026. Congress delegated to the FHLBB broad authority to establish and regulate a uniform system of savings and loan institutions and the Board has regulated them comprehensively, including regulation of lending practices. *Id.* at 3029.

The United States Supreme Court also recognized in *de la Cuesta*, 102 S.Ct. at 3031, that the Board's regulatory power is not limited only to a savings and loan's internal management but extends also to an association's "external" matters such as relationships with borrowers (thus criticizing *Gulf Federal Savings & Loan Ass'n v. Federal Home Loan Bank Board*, 651 F.2d 259, 266, (5th Cir.1981), *cert. denied*, 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982)). Nevertheless, the regulation of loan practices directly affects the internal management and operations and requires uniform federal control. *Kaski v. First Federal Savings and Loan Ass'n*, 72 Wis.2d 132, 142, 240 N.W.2d 367, 373 (1976), *cited and quoted with approval* in *de la Cuesta*, 102 S.Ct. at 3031. In this case, acceptance or rejection of mortgagee's title insurance policies in addition to the actual issuance of loans are a part of Roosevelt's lending practices and require uniform federal control.

The FHLBB governs savings and loans by what it deems to be "the best practices of thrift institutions in the United States," § 5(a) HOLA, 12 U.S.C. § 1464(a), not what any particular state deems the best practices. Congress expressly contemplated and approved the Board's promulgation of regulations superceding state law. *de la Cuesta*, 102 S.Ct. at 3026. Although the regulations and the HOLA explicitly incorporate and preempt state law in certain parts, the Board's authority to preempt state law is not limited to those areas specifically described by the act's provisions. *Id.* at 3027.[3]

Roosevelt argued that the FHLBB authorized its actions in rejecting plaintiffs' title policies under 12 C.F.R. § 563.35 (1983). It also argued that the loan commitment, which stated, "A mortgagee's title insurance policy written by a title insurance company acceptable to the Association shall be required, the cost of which shall be paid by the Borrower," also gave it the right to reject any title company. Plaintiffs countered that 12 C.F.R. § 563.35(c) (1983), relied on by Roosevelt, actually limited the language in the loan commitment. Section 563.35, in pertinent part provides:

(a) *Tie-in prohibitions.* No insured institution or service corporation affiliate thereof may grant any loan on the prior condition, agreement, or understanding that the borrower contract with any specific person or organization for the following:

(1) Insurance services (as an agent, broker, or underwriter), except insurance or a guarantee provided by a government agency or private mortgage insurance;

. . . . .

---

**3.** Cases determining that FHLBB regulations preempted state law: *de la Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (due-on-sale clause regulations preempt state law); *Gate Co. v. Midwest Federal Savings and Loan Ass'n*, 324 N.W.2d 202 (Minn.1982) (state due-on-sale clause law preempted); *Collins v. Union Federal Savings and Loan Ass'n*, Nev., 662 P.2d 610, 617–18 (Nev.1983) (late charge regulations preempt state law); *Tokarz v. Frontier Federal Savings and Loan Ass'n*, 33 Wash.App. 456, 656 P.2d 1089 (1983) (federal savings and loan exempt from state Consumer Protection Act since area is exclusively governed by federal law and regulations). *But see Shea v. First Federal Savings and Loan Ass'n*, 184 Conn. 285, 439 A.2d 997 (1981) (state anti-trust action against savings and loan not in conflict with federal law); *Derenco, Inc. v. Benjamin Franklin Federal Savings and Loan Ass'n*, 281 Or. 533, 577 P.2d 477 (1979), *cert. denied*, 439 U.S. 1051, 99 S.Ct. 733, 58 L.Ed.2d 712 (1978) (Board regulations authorizing reserve accounts do not occupy field of reserve accounts or preempt state law requiring interest on such accounts). Note that *Shea* and *Derenco* were decided before the Supreme Court's recognition of the Board's broad preemptive powers in *de la Cuesta*. *See also* cases cited in *de la Cuesta*, 102 S.Ct. at 3021, n. 9.

(b) *Notice with respect to insurance on home loans.* An insured institution or subsidiary thereof shall notify the borrower in writing of his right to freely select the person or organization rendering the insurance services referred to in paragraph (a)(1) of this section in connection with a loan on a home ... at or prior to the time of the written commitment to make such loan.

(c) *Limitation on paragraphs (a) and (b) of this section.* Notwithstanding paragraphs (a) and (b) of this section, an insured institution or subsidiary thereof may refuse to make any loan if it believes on reasonable grounds that the insurance services provided by the person or organization selected by the borrower will afford insufficient protection to such institution or subsidiary.

Examining plaintiffs' prayer for injunction, it seems clear that they view paragraph (c) as a limit on the loan commitment provision, and that they interpret "insufficient protection" as relating only to "financial insecurity," since the parties stipulated that they had no objection to plaintiffs' solvency. Plaintiffs are thus asking the court to enforce this provision, as they interpret it through the injunction.[4] Part (1) of the requested injunction, put in context, is really the relief requested in parts (2) and (3). Enjoining Roosevelt from interfering with plaintiffs' contracts and expectancies would have the same effect as enjoining Roosevelt from refusing to issue loans to borrowers who had obtained lender's title insurance from Community or Chicago, or enjoining Roosevelt from refusing to accept Community or Chicago's policies.

▆▆▆▆ We believe the requested injunction would interfere with the FHLBB's regulatory and supervisory power and interfere with the policy of uniform federal control. Clearly the FHLBB's supervisory and regulatory power should be free of any state legislative control which would impinge upon the exclusivity of Congress and the Board to set policies relating to federal lending practices. *Kaski v. First Federal Savings and Loan Ass'n,* 240 N.W.2d at 371. Moreover, any regulatory power which a state attempts to exercise that potentially conflicts with federal legislation or its purpose, or that results in lack of uniformity in the lending practices is subordinate to federal law. *Id.* at 373. The Bank Board's regulatory control is so pervasive as to leave no room for state regulatory control. *Conference of Federal Savings and Loan Ass'n's v. Stein,* 604 F.2d 1256, 1260 (9th Cir.1979), *aff'd mem.* 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980).[5]

**4.** If plaintiffs' petition is construed as one to interpret and enforce a FHLBB regulation, there is some doubt as to whether there is such a private cause of action. *See Gate Co. v. Midwest Federal Savings and Loan Ass'n,* 324 N.W.2d 202, 207 (Minn.1982) (question of whether savings and loan could accelerate loan upon transfer by contract for deed may be limited by FHLBB regulations but proper forum for resolution of issue as it pertains to regulations is not Minnesota court but FHLBB); *Toolan v. Trevose Federal Savings and Loan,* 501 Pa. 477, 462 A.2d 224, 228 (1983) (allegation of violation of prepayment penalty regulation confers no right to bring a private cause of action; remedy, if any, lies with the FHLBB); *Tokarz v. Frontier Federal Savings and Loan Ass'n,* 33 Wash.App. 456, 656 P.2d 1089, 1095 (1983) (primary jurisdiction over claims of nondisclosure was with FHLBB). Note that these cases were decided after *de la Cuesta. See also First Hawaiian Bank v. Alexander,* 558 F.Supp. 1128 (D.Hawaii 1983) (no private cause of action for violation of a FHLBB regulation although there is a federal common law cause of action for breach of fiduciary duty). However, if the FHLBB has had an opportunity to act under 12 U.S.C. § 1464(d)(2) and has not, then there is a private cause of action. *Goldman v. First Federal Savings and Loan Ass'n,* 518 F.2d 1247, 1250 (7th Cir.1975) (assumes a cause of action but expresses doubt); *Milberg v. Lawrence Cedarhurst Federal Savings and Loan Ass'n,* 496 F.2d 523, 525 (2d Cir.1974); *King v. Edwards,* 559 F.Supp. 75, 82–84 (N.D.Ga. 1982).

**5.** Further, if Congress has occupied a particular field, state courts may not enforce even consistent or complementary state laws in the occupied area, *Shea v. First Federal Savings and Loan Ass'n,* 184 Conn. 285, 439 A.2d 997, 1001 (1981), and the states cannot exercise concomitant or supplementary regulatory authority. *United States v. State of New York,* 552 F.Supp. 255, 263 (N.D.N.Y.1982); *International Trading, Ltd. v. Bell,* 262 Ark. 244, 556 S.W.2d 420, 425

■ A state court cannot, by injunction, regulate what the legislature by statute cannot regulate. At least one state court has held that its courts have no power to interfere in the internal affairs of a federal savings and loan. *See People v. Metrim Corp.*, 187 Cal.App.2d 289, 292, 9 Cal.Rptr. 584, 587 (1960). *See also Washington Federal Savings and Loan Ass'n v. Balaban*, 281 So.2d 15 (Fla.1973) (state court had no power to issue injunction preventing savings and loan from attending hearing called by FHLBB, as federal government has preempted regulation and supervision of federal savings and loans); *City Federal Savings and Loan Ass'n v. Crowley*, 393 F.Supp. 644, 655 (E.D.Wis.1975) (HOLA and regulations preclude any state legislation from applying).

Allowing states to pass on questions regarding lending practices would have a disruptive effect on the federal savings and loan system. *Rettig v. Arlington Heights Federal Savings and Loan Ass'n*, 405 F.Supp. 819, 826–27 (N.D.Ill.1975) (even where conduct is not specifically proscribed by a regulation, such as questions regarding bank directors' fiduciary obligations, federal common law should apply to fill out the regulatory framework, not state law). *See First Hawaiian Bank v. Alexander*, 558 F.Supp. 1128, 1132 (D.Hawaii 1983) (uniquely federal interests required formu-

lation of single federal standard for director's breach of fiduciary duty); *Shea v. First Federal Savings and Loan Ass'n*, 184 Conn. 285, 439 A.2d 997, 1003 (1981) (as Congress contemplated uniform national lending procedures for federal associations, state legislation may not impinge upon Board's power to regulate and supervise lending practices); *Olsen v. Financial Federal Savings and Loan Ass'n*, 105 Ill. App.3d 364, 61 Ill.Dec. 253, 259, 434 N.E.2d 406, 412 (1982) (by promulgating regulations on federal savings and loans' use of escrow accounts, Board attempted to establish national uniform policies and standards of lending practices, and state cannot thwart intent of Congress to achieve a national policy); *Kaski*, 240 N.W.2d at 372 (establishment of a federal system of banking is of such importance that, for the most part, state laws should not be allowed to interfere since Congress considered that regulation of lending procedures of federal institutions required national and uniform regulation); *See also Beal v. First Federal Savings and Loan Ass'n*, 90 Wis.2d 171, 279 N.W.2d 693, 704 (1979) (Board's regulations are so all-pervasive that state common law has no application to asserted cause of action for enforcement of compliance with a regulation).[6]

■ Although the lending practices of savings and loans are exclusively con-

(1977) *cert. denied* 436 U.S. 956, 98 S.Ct. 3068, 57 L.Ed.2d 1120 (1978). If the field is preempted by regulation so pervasive that it leaves no room for state action, such as here, complementary or supplementary state regulation is as invalid as one directly conflicting with the federal scheme, since preemption forbids state regulation either to advance or retard the federal purpose. *KVUE, Inc. v. Austin Broadcasting Corp.*, 709 F.2d 922, 931 (5th Cir.1983).

6. Another indication of the all-pervasiveness of the federal regulations regarding lending practices are the federal regulations regarding preemption expressed in the regulations promulgated since *de la Cuesta.* 12 C.F.R. § 545.6(a)(2) (1983) provided:

> (2) *Federal preemption.* The regulations in this Part 545 governing real estate loans are promulgated pursuant to the plenary and exclusive authority of the Board to regulate all aspects of the operations of Federal associa-

tions, . . . . This exercise of the Board's authority is preemptive of any state law purporting to address the subject of a Federal association's ability or right to make, sell, purchase, participate or otherwise deal in the mortgage loan instruments set forth in this part, or directly or indirectly to restrict such ability or right.

This provision, appearing almost dispositive of the question of whether a state court could issue an injunction of the type requested, was amended May 23, 1983, and broadened in 12 C.F.R. § 545.2 which states:

> The regulations in this Part 545 are promulgated pursuant to the plenary and exclusive authority of the Board to regulate all aspects of the operations of Federal associations, . . . this exercise of the Board's authority is preemptive of any state law purporting to address the subject of the operations of a Federal association.

Lending practices are clearly within the "operations" of a savings and loan.

trolled by Congress, the FHLBB, and federal law, it is not axiomatic that state courts lack jurisdiction in any action where a federal savings and loan is a defendant. *Kaski v. First Federal Savings and Loan Ass'n*, 240 N.W.2d at 373; *Shea v. Federal Savings and Loan Ass'n*, 439 A.2d at 1000. *See Matter of McVann*, 96 Misc.2d 879, 409 N.Y.S.2d 923, 925 (1978) (state court has jurisdiction but federal law will prevail when dealing with internal affairs of savings and loan); *Murphy v. Colonial Federal Savings and Loan Ass'n*, 388 F.2d 609, 612 (2d Cir.1967) (state courts apply federal common law when dealing with internal matters of federal savings and loan); *City Federal Savings and Loan Ass'n v. Crowley*, 393 F.Supp. at 655; *Northwestern Federal Savings and Loan Ass'n v. Ternes*, 315 N.W.2d 296, 300 (N.D.1982) (Congress intended state law to apply only under those conditions or circumstances specifically stated in the HOLA). A state court may have subject matter jurisdiction when the area has been preempted unless it would be incompatible with congressional objectives.[7] *Shea*, 439 A.2d at 1000.

An injunction of the type requested would require our state courts, even applying and interpreting the federal regulation, to monitor and supervise Roosevelt's lending decisions for an indefinite period of time. Not only would this interfere with a policy of uniform federal control, but it would be an undue burden on the court.

We note that plaintiffs did not bring a breach of contract or tort claim alleging actual damages. Such a cause of action might have required a different analysis. *See Goldman v. First Federal Savings and Loan Ass'n*, 518 F.2d 1247, 1252 (7th Cir.1975) (contract claim would be under state law); *North Barrington Development v. Fanslow*, 547 F.Supp. 207 (N.D.Ill. 1980) (fraud and breach of contract); *But see City Federal Savings and Loan Ass'n v. Crowley*, 393 F.Supp. at 656 (federal

common law governs claim of breach of fiduciary duty).

We find therefore, that the trial court did not abuse its discretion in denying plaintiffs' requested relief in that the injunction was inappropriate under these circumstances.

Roosevelt Federal argues in its cross-appeal that the trial court erred: (1) in concluding that Community's interference with Roosevelt's contractual relations was privileged; (2) in finding that Community did not intentionally interfere with Roosevelt's contractual relations; (3) in holding that injunction was an inappropriate remedy; and (4) in concluding that money damages were too remote and speculative. Plaintiffs add a ground supporting the trial court's judgment which we find dispositive of this appeal: Roosevelt failed to prove, by substantial evidence, the critical element of causation in its tortious interference claim. We also find that the trial court correctly ruled that Roosevelt failed to prove damages, another necessary element. We therefore need not address Roosevelt's first three points.

Roosevelt argued that plaintiffs knew of the due-on-sale clauses in its deeds of trust, but to frustrate Roosevelt's rights, plaintiffs tortiously interfered with Roosevelt's contractual rights under the deeds of trust by inducing, procuring, and assisting Roosevelt's borrowers to sell their homes by means of the contract for deed and to conceal the sale and conveyance from Roosevelt, so as to evade acceleration of the loans. Roosevelt asked for an injunction to prevent plaintiffs from further interfering or attempting to interfere with Roosevelt's contract rights.

 The elements of a cause of action for tortious interference with a contract or business expectancy are:

(1) A contract or a valid business relationship or expectancy (not necessarily a contract);

---

7. We note also that even if a state court has subject matter jurisdiction it does not mean that the state court must always proceed to resolve

the dispute. The complaint arising in a preempted area may not state a claim upon which relief can be granted. *See Shea*, 439 A.2d at 1000 n. 6.

(2) Defendant's [Plaintiffs] knowledge of the contract or relationship;

(3) Intentional interference by [plaintiffs] in inducing or causing a breach of the contract or relationship;

(4) The absence of justification;

(5) Damages resulting from [plaintiffs'] conduct.

*Friedman v. Edward L. Bakewell, Inc.,* 654 S.W.2d 367, 368–69 (Mo.App.1983); *Salomon v. Crown Life Insurance Co.,* 536 F.2d 1233, 1238 (8th Cir.1976) *cert. denied,* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976); *Harber v. Ohio National Life Insurance Co.,* 390 F.Supp. 678, 683 (E.D.Mo. 1974), *aff'd,* 512 F.2d 170 (8th Cir.1975).

■ Liability under this tort cannot be predicated upon speculation, conjecture or guesswork, and no fact essential to submissibility can be inferred absent a substantial evidentiary basis. *Francisco v. Kansas City Star Co.,* 629 S.W.2d 524, 529 (Mo. App.1981).

To succeed, Roosevelt had to prove that plaintiffs actively and affirmatively took steps to induce a breach of contract (assuming, without deciding that borrowers who entered into contracts for deeds without informing Roosevelt breached their contracts), and also needed to make an additional showing that plaintiffs' affirmative conduct caused the breach—that had it not been for plaintiffs' acts, the contracts would have been performed. *Tri-Continental Leasing Co. v. Neidhardt,* 540 S.W.2d 210, 216 (Mo.App.1976). *See Martin v. Texaco, Inc.,* 304 F.Supp. 498, 502 (S.D.Miss.1969). Our courts apply essentially a "but for" test of causation. "The rule presupposes that the party defaulting was ready, able, and willing to perform and would have done so if it had not been

prevented or persuaded by the malicious and unwarranted interference of a third party." *United States v. Newbury Mfg. Co.,* 36 F.Supp. 602, 605 (D.Mass.1941), *quoted in Tri-Continental,* 540 S.W.2d at 216.

Under *Tri-Continental,* 540 S.W.2d at 217, we follow a two-step approach: (1) did plaintiffs actively and affirmatively take steps to induce the breach; *and* if so, (2) would the contracts have been performed absent plaintiffs' interference. Roosevelt failed to prove the second part of this test.

■ The trial court's finding that "it is impossible to determine that the parties [Roosevelt's borrowers] would have closed their sale with a voluntary pay-off of Roosevelt's existing loan, had Community not made available to them the idea of a contract for deed," is supported by substantial evidence. The trial court concluded that sellers would merely go elsewhere to avoid acceleration of the loan. There was evidence that with high interest rates, a contract for deed was often seen as a last resort, since it preserved the borrower's existing low interest mortgage. Without Community's contract for deed program it is just as likely that no conventional or contract for deed sale would occur, as it is that the sale would be consummated and Roosevelt's borrowers would pay off the balance of the loan. If the sales had not closed at all, Roosevelt would have had no opportunity to accelerate the loans. There is no evidence to find, without resort to speculation and conjecture, that "but for" Community's [8] actions, Roosevelt's borrowers would have sold their homes, closed on the sales, informed Roosevelt, and paid off the balance of their mortgages on the date of the closing.[9] The trial court cannot

---

**8.** Although not necessary to the decision, we note that Roosevelt never proved that Chicago actually participated in any contract for deed transactions but maintained that Chicago should be enjoined since it is controlled by Community. However, corporations are separate legal entities and ordinarily are to be regarded as such. Full ownership is not enough to find a parent corporation identical to its subsidiary. Further, even if a party establishes

that a subsidiary is no more that a parent's "alter ego," the party must establish that equity requires that the two corporations be treated as one. *Phil Crowley Steel Corp. v. Sharon Steel Corp.,* 702 F.2d 719, 722 (8th Cir.1983).

**9.** There was evidence of a letter written by a borrower's son asking Roosevelt to waive the prepayment penalty on his mother's mortgage so that she could sell her house, as she could not

make Roosevelt's case by supplying or conjuring needed evidence. *Tri-Continental* 540 S.W.2d at 218.

 Moreover, the trial court correctly held that Roosevelt's damages are too speculative and remote. Roosevelt sought damages for the lost earnings that acceleration of its loans under Community's contracts for deed would have brought upon reissuance of loans at a higher rate of interest. In order to recover lost profits, Roosevelt must produce evidence that affords a sufficient basis for estimating their amount with reasonable certainty. *M.J.S. Resources, Inc. v. Circle G. Coal Co.,* 506 F.Supp. 341, 349 (E.D.Mo.1980). Losses must be made reasonably certain by proof of actual facts which present data for a rational estimate without resorting to speculation. *Oster v. Kribs Ford, Inc.,* 660 S.W.2d 348, 353 (Mo.App.1983). Roosevelt has failed to produce sufficient evidence.

Roosevelt attempted to measure damages as of the date of the contract for deed, assuming that loans would have been paid as of that date. Roosevelt failed to prove this. As the trial court noted, Roosevelt has no uniform policy regarding due-on-sale clauses—as it did not necessarily call in loans in all instances. In addition, borrowers had the opportunity to cure any default, as the standard deed of trust granted thirty days to cure. Roosevelt conceded that foreclosure on a loan could take sixty to ninety days. There was no evidence that Roosevelt would or could have loaned the money at the higher rates, given the scarcity of borrowers.

Roosevelt wholly failed to prove that it sustained any loss, and there is no evidence that any claimed losses were occasioned by Community's acts. *See Salomon v. Crown Life Ins. Co.,* 536 F.2d 1233, 1243 n. 5 (8th Cir.1976). In both respects, the trial court was left to sink in a sea of speculation.

afford the payments. Roosevelt refused, and the mother subsequently entered into a contract for deed transaction with Community. The letter is not substantial evidence that without Community, she would have sold and paid off the loan, however. Indeed, this seems to be an

We affirm the trial court's judgment on the appeal and cross-appeal.

CRIST, P.J., and GAERTNER, J., concur.

instance of someone "predisposed" to "breach." *See Tri-Continental,* 540 S.W.2d at 216. The trial court simply did not have adequate testimony or evidence from a borrower establishing the requisite causal connection.